UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE ANNE GERRICK,                    Case No. 15-12998

        Plaintiff,                    George Caram Steeh
v.                                         United States District Judge

CAROLYN W. COLVIN,                         Stephanie Dawkins Davis
                                           United States Magistrate Judge

        Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkt. 12, 14)**

## I.   PROCEDURAL HISTORY

    A.   <u>Proceedings in this Court</u>

On August 24, 2015, plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits.  (Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), District Judge George Caram Steeh referred this matter to the undersigned for the purpose of reviewing the Commissioner's decision denying plaintiff's claims.  (Dkt. 3).  This matter is before the Court on cross-motions for summary judgment.  (Dkt. 12, 14).  Plaintiff also filed a reply in support of her motion for summary judgment.  (Dkt. 15).  The cross-motions are now ready for report and recommendation.

B.     Administrative Proceedings

On September 13, 2012, plaintiff filed claims for a period of disability and disability insurance benefits.  (Dkt. 9-2, Pg ID 40).   In both applications, plaintiff alleged a disability beginning August 25, 2011.  The Commissioner initially denied plaintiff's disability applications on January 9, 2013.  *Id*.  Thereafter, plaintiff requested an administrative hearing, and on February 4, 2014, she appeared with counsel before Administrative Law Judge ("ALJ") J. William Callahan, who considered her case *de novo*.  (Dkt. 9-2, Pg ID 61-96).  In a March 14, 2014 decision, the ALJ determined that plaintiff was not disabled within the meaning of the Social Security Act.  *Id*. at Pg ID 37-49.  The ALJ's decision became the final decision of the Commissioner on June 24, 2015, when after reviewing additional exhibits,[1] the Social Security Administration's Appeals Council denied plaintiff's request for review.  *Id*. at Pg ID 30-33.

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that defendant's motion

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

for summary judgment be **DENIED**, and that, pursuant to 42 U.S.C. § 405(g), the

decision of the Commissioner of Social Security be **REVERSED AND**

**REMANDED** for proceedings consistent with this Report and Recommendation.

## II.     FACTUAL BACKGROUND

A.     ALJ's Findings

Plaintiff was 33 years old on the last date insured.  (Dkt. 9-2, Pg ID 47).

Plaintiff has past relevant work as a medical receptionist, but she stopped working

in 2007 for reasons unrelated to her health or disability.  (Dkt. 9-2, Pg ID 47, 67).

The ALJ applied the five-step disability analysis to plaintiff's claims and found at

step one that between the alleged onset date and plaintiff last date insured of

December 31, 2012, plaintiff did not engage in any substantial gainful activity.  *Id.*

at Pg ID 42.  At step two, the ALJ found that plaintiff had the following severe

impairments: hypertension, dissection of the left cervical internal carotid artery,

without neurological impairment, and history of migraine.  *Id.*  At step three, the

ALJ found that plaintiff did not have an impairment or combination of

impairments that met or equaled one of the listings in the regulations.  *Id.* at 43.

The ALJ determined the following as to plaintiff's residual functional capacity

(RFC):

> After careful consideration of the entire record, I find
> that, through the date last insured, the claimant had the
> residual functional capacity to perform light work as

3

> defined in 20 CFR 404.1567(b) except she is able to lift
> and carry up to 5 pounds frequently, sit, stand or walk an
> hour at a time, and able to stand or walk up to 6 hours in
> an 8-hour day. She must be allowed to walk 5 minutes
> every hour, or to stand or stretch. She is capable of
> continuous bilateral fingering and feeling, and frequent,
> but not constant, handling. The claimant can only
> occasionally reach in any direction, and can only
> occasionally push or pull, or operate foot controls. She
> cannot engage in repetitive crouching, squatting,
> crawling, or bending. She cannot work with fast-moving
> or dangerous equipment, she should not drive, and she
> cannot perform work at unprotected heights. The
> claimant can have only incidental contact with the
> general public, and occasional contact with coworkers
> and supervisors.

*Id.* at Pg ID 43.  At step four, the ALJ determined that plaintiff could not perform

her past relevant work.  *Id.* at Pg ID 47.  At step five, the ALJ concluded that

based on plaintiff's age, education, work experience and RFC, there were jobs that

existed in significant numbers in the national economy that plaintiff could have

performed and, therefore, she was not under a disability at any time from the

alleged onset date through the date last insured.  *Id.* at Pg ID 48-49.

 B. <u>Plaintiff's Claims of Error</u>

 Plaintiff contends that the ALJ made an impermissible credibility finding by

failing to give deference to her consistent and medically supported complaints of

pain, in violation of the rules relating to credibility determinations. The ALJ

concluded that "while the claimant likely appears to be experiencing some

limitations as a result of her carotid artery dissection and hypertension, these

restrictions are not severe enough to preclude the claimant from working

altogether." (Dkt. 9-2, Pg ID 46). He lists the facts that the diagnostic testing has

not changed or worsened, and she received conservative treatment as a reasons to

question her complaints. (Dkt. 9-2, Pg ID 46-47. According to plaintiff, this

conclusion appears not to take into consideration the University of Michigan

MRA which revealed additional cerebrovascular problems. Carotid artery

dissection is a separation of the layers of the artery wall supplying oxygen bearing

blood to the head and is the most common cause of stroke in young adults. In

plaintiff's case numerous diagnostic tests clearly identified the condition.

The ALJ also appears to question the severity of the condition on the basis

that "her symptoms were not more serious ones requiring surgical intervention."

(Dkt. 9-2, Pg ID 47). According to plaintiff, this is contrary to the reports of

University of Michigan vascular surgeon Dr. Coleman's position that "her surgical

and endovascular options for treatment are limited given the skull-based location

of this pseudo-aneurysm." (Dkt. 9-7, Pg ID 540). Plaintiff contends that the

condition is inoperable and her credibility should not be impugned on this basis.

(Dkt. 9-6, 206).

Plaintiff also posits that the ALJ failed to consider her daily activities; the

location, frequency, and intensity of the pain; precipitating and aggravating

5

factors; the type, dosage and side effects of mediation; treatment for pain; or any other measures taken to relieve the pain as required by the regulations. Plaintiff's testimony at the hearing was noted to be consistent with the information she provided to her doctors and explains her functional limitations. The ALJ did not state any deficiency in concentration and did not address the effects of the medication which included Xanax and blood pressure medications claimed to cause side effects. Plaintiff also points out that there was no finding as to her abilities to maintain concentration, persistence or pace stated in the decision despite testimony relating to chronic migraine headaches, word recognition issues and radiating pain and numbness.

The ALJ also did not acknowledge any psychiatric conditions as severe impairments despite multiple statements in the medical records of anxiety and a consultative examination that listed a diagnosis of "Major Depressive Disorder, recurrent, moderate (296.32), Generalized Anxiety Disorder (300.02) and Panic Disorder without Agoraphobia (300.01). Psychosocial stressors were noted to be severe with a Global Assessment of Functioning indicated to be 55. (Dkt. 9-7, Pg ID 424-425). According to plaintiff, the decision questioned the lack of mental health treatment but did not address her financial condition and inability to obtain treatment.

Plaintiff also argues that the ALJ improperly used the lack of treating source

opinions to challenge her credibility in relation to her functional limitations. The decision contains an Interrogatory sent to Dr. Karl Manders and his answers were given "very significant weight" when addressing the abilities and limitations. (Dkt. 9-2, Pg ID 46). Plaintiff points out, however, that the record does not contain any of the qualifications or refer to any of the information relied on by Dr. Manders to formulate his opinion. There is no explanation as to what information was reviewed and no physical examination was performed by Dr. Manders. There is no indication that Dr. Manders had access to the followup reports made by Dr. Friedland, the primary care physician reports from Dr. Crandall, the liver function reports from Dr. Folbe, or most importantly, the treatment notes from the vascular department at the University of Michigan.

Plaintiff also points out that the treatment information from the University of Michigan is not noted in the decision. As indicated above, the record clearly indicates that surgical intervention was not an alternative. Furthermore, the additional testing revealed a defect in another portion of the brain stem relating to a left-sided aortic arch with right aberrant subclavian artery with no focal aneurysm dilation at the origin of the aberrant subclavian artery. (Dkt. 9-8, Pg ID, 580). According to plaintiff, this directly conflicts with the ALJ's assertion that the condition was stable and not progressive.

Plaintiff also contends that her anxiety and the related psychiatric symptoms

were not given appropriate consideration when assessing credibility despite: 1) the repeated references to anxiety, 2) the consultative examination which demonstrated psychiatric deficiencies, and 3) the ongoing prescription for anti-anxiety medications.

According to plaintiff, the ALJ found that she had the ability to perform "light work" with the ability to lift and carry only 5 pounds frequently, which conflicts with the vocational testimony provided at the hearing that a restriction with such a limitation changed the job classification to sedentary. (Dkt. 9-2, Pg ID, 91-92). Despite the "light" classification, the ALJ appears to have adopted the vocational findings related to unskilled "sedentary" employment identified by the vocational expert consisting of a lens inserter (900 jobs in Michigan) and surveillance monitor (2,500 jobs in Michigan). (Dkt. 9-2, Pg ID 48). Thus, plaintiff says that the residual functional capacity finding did not take the non-exertional limitations into consideration when the residual functional capacity was formulated, in violation of the SSR 96-8p. Pursuant to SSR 96-8p the RFC assessment must address both the remaining exertional and nonexertional capacities of the individual. According to plaintiff, the ALJ's RFC improperly discounted the non-exertional limitations and was fundamentally flawed as it did not accurately depict her physical condition. For instance, plaintiff's tinnitus and limitations in hearing were not included in the hypothetical. The record clearly

8

and repeatedly states difficulties with hypertension and the need to lay down due to fatigue.  Moreover, plaintiff asserts that the residual functional capacity appears to be based on the opinion of an unidentified physician, which renders it impossible to determine what information was examined or even his medical speciality in the record.  Furthermore, the ALJ discounted the severity of the medical condition when he indicated that the condition was not severe enough to be surgical - a conclusion which conflicts with medical records indicating that the location of the affliction precludes surgery as an option.  Plaintiff also points out that the records from the treating pulmonary physicians are not discussed in the decision and may not have been reviewed by the physician who responded to the interrogatories. Despite the stated issues, the ALJ only identified a very small number of positions that plaintiff could perform and plaintiff maintains that the decision should be reversed due to the Commissioner's failure to meet the burden of proof at Step Five of the sequential analysis.

Finally, plaintiff contends that her condition meets and/or equals Listing 4.10.  Plaintiff says that there is clear diagnostic imaging of a dissection that is not operable.  In addition, there are clear indications of blood flow deficiencies to the brain with documented treatment for chronic migraine headaches as set forth above.  There was also treatment for elevated liver enzymes and a modification of the pain management that included the cessation of the use of narcotic medications

9

due to changing levels.  As described in the University of Michigan test results,

the condition also involves the right aberrant subclavian artery with no focal

aneurysm dilation at the origin of the aberrant subclavian artery.  The decision

indicates that Listing 4.10 was considered but not applied with a reference to Dr.

Karl Manders' report.  Plaintiff contends that Listing 4.10 is directly applicable to

her case with both a progression of the condition as indicated in the University of

Michigan test results as well as involvement in the blood flow to the brain and

liver.

> C.   <u>The Commissioner's Motion for Summary Judgment</u>

The Commissioner first addresses plaintiff's claim that she met Listing 4.10.

The listing at issue in this case, 4.10, required plaintiff to demonstrate that she

experienced an "[a]neurysm of [the] aorta or [its] major branches, due to any

cause…demonstrated by appropriate medically acceptable imaging, with

dissection not controlled by prescribed treatment."  20 C.F.R. Pt. 404, Subpt. P,

App. 1 § 4.10.  Computed tomography angiography imaging showed that plaintiff

had a "dissection with aneurysm" in her left internal carotid artery.  (Dkt. 9-7, Pg

ID 435, 446).  The Commissioner suggests that plaintiff does not meet the Listing

because the left internal carotid artery, branches off from the left common carotid

artery, not the aorta.  *See* Embryology Vascular Development, Slideshare.com,

http://image.slidesharecdn.com/embryology-vasculardevelopment-100618081101-

phpapp01/95/embryology-vascular-development-11-728.jpg?cb=1276848700 (last visited 3/3/2016). Yet, the Commissioner's primary argument is that this need not be decided because wherever her dissection occurred, plaintiff is unable to show that it was "not controlled by prescribed treatment."

A dissection is "not controlled when [the claimant has] persistence of chest pain due to progression of the dissection, an increase in the size of the aneurysm, or compression of one or more branches of the aorta supplying the heart, kidneys, brain, or other organs." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § (H)(d)(6). According to the Commissioner, plaintiff's dissection did not progress and she repeatedly denied chest pain. (Dkt. 9-7, Pg ID 240, 244, 257, 261, 267, 369, 436, 517). Her left internal carotid artery was noted to be "without significant stenosis or compression." (Dkt. 9-7, Pg ID 283); *see also* (Dkt. 9-7, Pg ID 278) ("No significant stenosis of the common or internal carotid arteries"); (Dkt. 9-7, Pg ID 539) (showing only "mild narrowing"); (Dkt. 9-8, Pg ID 580) (no significant stenosis in the internal carotid arteries). And her aneurysm was repeatedly referred to as stable, or unchanged. (Dkt. 9-7, Pg ID 283, 435, 446); *see also* (Dkt. 9-7, Pg ID 537) (noting "no progression" of the aneurysm as of November 2012). The Commissioner points out that Dr. Karl Manders reviewed much of this evidence and concluded that plaintiff did not meet listing 4.10 (Dkt. 5-7, Pg ID 511), and plaintiff cannot point to a medical opinion contradicting this one. The

Commissioner says that plaintiff addresses none of this evidence and instead erroneously contends that she has a "dissection that is not operable." (Dkt. 12, at 38). According to the Commissioner, operability has nothing to do with this listing and, even if it did, it would not get plaintiff anywhere. Despite her repeated suggestions that her dissection was inoperable, the Commissioner points out that her doctor said something different:

> Given the present radiographic stability in pseudoaneurysm size and dissection, I recommend ongoing conservative management with blood pressure control…and single-agent any-platelet therapy. She should be re-imaged in [six] months for surveillance. Her surgical and endovascular options for treatment are limited given the skullbased location of this pseudoaneurysm—would reserve for marked progression in pseudoaneurysm size/symptoms/stroke.

(Dkt. 9-7, Pg ID 539-540). In other words, the Commissioners says that surgery was difficult, but not impossible. And, more importantly, it was not warranted, given the stability of plaintiff's condition.

While plaintiff claims that there "are clear indications of blood flow deficiencies to the brain with documented treatment for chronic migraine headaches as set forth above" (Dkt. 12, at 38), the Commissioner says that she cites nothing in support of this statement. She earlier mentioned that "[s]he testified that she woke up with a headache every day that doctors indicated could be related to low blood flow." (Dkt. 12, at 20, citing Dkt. 9-1, Pg ID 73-74). Even

12

if a claimant could satisfy a listing by testifying to the contents of a medical report that does not appear in the record, it is clear that plaintiff was referring to evidence created over a year after her date last insured. (Dkt. 9-2, Pg ID 73-74) (Plaintiff testifying at the February 2014 hearing that she saw her "vascular surgeon yesterday and we did touch on the subject again about the headaches… she did say that it could be due to the low blood flow"). "Evidence of disability obtained after the expiration of insured status is generally of little probative value"—even more so when the claimant has not confirmed its existence by actually submitting it. *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004).

Plaintiff further contends that "there was treatment for elevated liver enzymes and a modification of the pain management with the ceasing of narcotic medications due to changing levels." (Dkt. 12, at 38). According to the Commissioner, plaintiff does not explain what this has to do with her left internal carotid artery dissection. Indeed, the left internal carotid artery supplies blood to the brain, not to the liver. Finally, plaintiff complains that "the condition also involves the right aberrant subclavian artery with no focal aneurysm dilation at the origin of the aberrant subclavian artery." (Dkt. 12, at 38-39). Again, plaintiff does not explain how this condition demonstrates an uncontrolled dissection in one of the aorta's major branches. According to the Commissioner, it is not clear that one condition "involved" the other, as her doctor referred to the two

13

disjunctively.  (Dkt. 9-7, Pg ID 524) ("A follow CT angiogram in July demonstrated the distal left dissection with aneurysm which appears unchanged. She also has an aberrant right subclavian artery, which is unchanged").  To the extent plaintiff claims that this condition satisfies listing 4.10—independent from her left internal carotid artery dissection—imaging showed that the artery, while aberrant, did not experience an aneurysm.  (Dkt. 9-8, Pg ID 580) ("Left-sided aortic arch with right aberrant subclavian artery with no focal aneurysmal dilation at the origin of the aberrant right subclavian artery").

Next, the Commissioner contends that the ALJ provided plenty of reasons for finding plaintiff's complaints not entirely credible.  First, the ALJ noted that, "[s]ince her dissection, [Plaintiff had] been consistently and routinely neurologically intact on clinical examinations [Dkt. 9-7, Pg ID 242, 253, 260, 286, 288, 301, 305, 306, 309, 311, 351, 371, 428, 436, 444)] despite her complaints of headaches [Dkt. 9-2, Pg ID 79], pain [*id*. at Pg ID 73, 81, 85] and numbness [*id*. at Pg ID 79]."  (Dkt. 9-2, Pg ID 47); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence").  Second, the ALJ found that "[i]n addition to [the] lack of any neurological deficits, [Plaintiff's] various diagnostic tests, namely CT angiograms, Doppler scans, and MRAs, have demonstrated that

14

[her] dissection is stable, and has not changed or worsened." (Dkt. 9-2, Pg ID 47);
*see also* (Dkt. 9-7, Pg ID 278, 281, 288, 299, 435, 446); *Bentley v. Comm'r of Soc.
Sec.*, 23 Fed. Appx. 434, 436 (6th Cir. 2001) ("As [the claimant's] testimony
conflicted with the objective medical evidence in the record, the ALJ did not
commit reversible error by rejecting [the claimant's] testimony"). Third, the ALJ
reasoned that "[t]here [had] been no documented issues with her coordination,
gait, muscle or motor strength, sensation, reflexes, or cranial nerves." (Dkt. 9-2,
Pg ID 47; Dkt. 9-7, Pg ID 240, 242, 255, 257-58, 260, 262, 291, 302, 306, 311,
317, 369, 371, 384, 387, 390, 400, 423, 428, 429, 432, 439, 444).

Fourth, the ALJ stated that "[i]t was decided in April of 2013 that [Plaintiff]
should be managed conservatively, further confirming that her symptoms were not
viewed as more serious ones requiring significant intervention." (Dkt. 9-2, Pg ID
47-48) (citing Dkt. 9-7, Pg ID 539-40); *see also Coloske v. Comm'r of Soc. Sec.*,
2014 WL 1048156, at *15 (E.D. Mich. Mar. 18, 2014) ("The ALJ also noted that
plaintiff's treatment was routine and conservative, which also undermines her
claim of disability"). Fifth, the ALJ opined that, "[a]lthough [Plaintiff] complained
of constant headaches at the hearing [Dkt. 9-2, Pg ID 73], she reported in
November of 2013 that she was not experiencing any headaches." (Dkt. 9-2, Pg
ID 48, citing Dkt. 9-8, Pg ID 567-68) (Plaintiff noting that she was "feeling well
with no complaints" and stating that she was not experiencing headaches); (*see*

15

*also* Dkt. 9-7, Pg ID 524) (Plaintiff stating that she only "wake[s] with headaches on occasion"); SSR 96-7p available at 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record"). Sixth, the ALJ found that the record did "not contain any statements from treating sources finding that [Plaintiff had] greater functional limitations than those outlined in [his] assessment of her residual functional capacity, or which further substantiate [her] allegations by indicating that her impairments adversely impact her ability to perform all work on a sustained basis." (Dkt. 9-2, Pg ID 48); *see also Piersante v. Comm'r of Soc. Sec.*, No. 13-11079, 2014 WL 1048157, at *15 (E.D. Mich. Mar. 18, 2014) (upholding a credibility determination where the ALJ noted, among other things, that "no treating physician indicated that the claimant was disabled since the alleged onset date").

Finally, the ALJ reasoned that Plaintiff "stated that she could not walk, because she needed to keep her blood pressure down, although those same November of 2013 progress notes state that she reported exercising on a daily basis." (Dkt. 9-2, Pg ID 48); see also (Dkt. 9-8, Pg ID 555) ("She exercises; she walks daily"); see also (Dkt. 9-8, Pg ID 567) ("Exercises regularly, walking). Yet, Plaintiff never testified that she could not walk: she said she was "able to walk as long as [her] heart rate…stay[ed] under 120…" (Dkt. 9-2, Pg ID 71), and that she

16

could walk for about ten to fifteen minutes.  (Dkt. 9-2, Pg ID 73).  The

Commissioner acknowledges that the inconsistency that the ALJ highlighted was

not actually there.  Nevertheless, the ability to walk is one of the primary ways the

administration gauges an individual's capability to perform the physical

requirements of a given job.  *See* 20 C.F.R. § 404.1521(b)(1). Inconsistent

statements or not, the fact that plaintiff admitted to walking on a regular basis for

exercise does not support her subjective complaints of disability.  Moreover, even

if the ALJ erred, that error was harmless because he provided at least six other

reasons in support of his credibility determination.  *Ulman v. Comm'r of Soc. Sec.,*

693 F.3d 709, 714 (6th Cir. 2012) (citation omitted) ("[s]o long as there remains

substantial evidence supporting the ALJ's conclusions on credibility and the error

does not negate the validity of the ALJ's ultimate credibility conclusion, such is

deemed harmless and does not warrant reversal").

　　　While plaintiff disputes the ALJ's statement that her dissection was stable,

the evidence she relies on post-dates her last date insured.  More specifically, she

points to evidence created in January 2014 that, according to her, shows a

deterioration in her condition.  (Dkt. 12, at 33-34, citing Dkt. 9-8, Pg ID 580).

Next, though plaintiff argues that the ALJ failed to consider the factors for

evaluating credibility located in 20 C.F.R. § 404.1529(c)(3)(i)-(vi), the

Commissioner points out that the ALJ stated that he considered Plaintiff's

symptoms in accordance with 20 C.F.R. § 404.1529 (Dkt. 9-2, Pg ID 43). Thus, even if the ALJ didn't explicitly discuss all of the factors, the Commissioner suggests plaintiff's claim in this regard is still extremely hard to credit.

Plaintiff also claims that the ALJ never discussed the side effects she experienced from her Xanax and Lopressor prescriptions. (Dkt. 12, at 32). But, according to the Commissioner, the medical evidence shows that those medications did not cause side effects. (Dkt. 9-7, Pg ID 308). She further faults the ALJ for not discussing her symptoms of fatigue and hearing loss. (Dkt. 12, at 37). The Commissioner asserts that the ALJ found that plaintiff's hearing loss was not a medically determinable impairment and therefore, it had no role to play in the RFC assessment. SSR 96-8p; 1996 WL 374184, at *1 ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments"). As for fatigue, plaintiff repeatedly denied it. (Dkt. 9-7, Pg ID 301, 428; Dkt. 9-8, Pg ID 568).

The ALJ found that plaintiff's anxiety was not a medically determinable impairment. The Commissioner says that plaintiff does not challenge this finding, but instead argues that the ALJ should have found that she experienced a severe psychiatric impairment. (Dkt. 12, at 32). She does so by reference to two things that say nothing about the severity of her mental impairments: diagnoses and

Global Assessment of Functioning (GAF) scores.  (Dkt. 12, at 32-33); *see also Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 779 (6th Cir. 2008) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)) ("[T]he mere diagnosis of [an impairment], of course, says nothing about the severity of the condition"); *see also DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. 2006) (GAF "scores have no direct correlation to the severity requirements of the mental disorders listings") (citation and quotations omitted). Plaintiff seems to argue that the RFC determination did not capture the full extent of her deficiencies in concentration.  (Dkt. 12, at 32)  But, according to the Commissioner, plaintiff "has not explained why more detailed or more specific nonexertional limitations are required in order to adequately account for [her] deficiencies in [concentration]. Nor has [s]he offered any suggestion as to what those additional limitations should be."  *Roberts v. Comm'n of Soc. Sec.*, No. 12-14661, 2013 WL 6062018, at *17 (E.D. Mich. Nov. 18, 2013).  In fact, she denied psychiatric impairments before and after her date last insured.  (Dkt. 9-7, Pg ID 436, 525, 538; Dkt. 9-8, Pg ID 568).  She had normal mental status examinations.  (Dkt. 9-7, Pg ID 302, 306, 311, 339, 343).  And she did not receive ongoing treatment for mental impairments.  *Hamlin v. Comm'r of Soc. Sec.*, 1996 WL 729287, at *2 (6th Cir. 1996) ("gaps in a history of medical treatment are likely to suggest that the claimant was not receiving treatment during the gaps and

19

was not disabled then").

Plaintiff counters that the ALJ could not fault her for her infrequent treatment because she simply could not afford it. (Dkt. 12, at 33). As plaintiff mentions (Dkt. 12, at 12), she stated in December 2012 that she had no insurance and was "unable to follow up with her medical issues." (Dkt. 9-7, Pg ID 421). However, an August 2012 note mentions her husband paying for "his family's health insurance" (DKt. 9-7, Pg ID 349), and plaintiff indicated that she had health insurance in January 2013. (Dkt. 9-7, Pg ID 441). Moreover, she repeatedly sought care for her physical impairments, demonstrating her "ability to obtain medical treatment when necessary." *Van Heck v. Comm'r of Soc. Sec.*, 2008 WL 1808320, at *6 (E.D. Mich. Apr. 21, 2008).

The Commissioner next asserts that the Court should reject plaintiff's complaints about Dr. Manders' assessment and the ALJ's reliance on it. In response to an interrogatory from the ALJ, Dr. Manders assessed plaintiff's RFC. (Dkt. 9-7, Pg ID 512- 515). The ALJ gave his opinion "very significant" weight. (Dkt. 9-2, Pg ID 46). Plaintiff claims that was too much because: the record did not contain Dr. Manders' qualifications; there is no explanation as to what evidence he reviewed; and Dr. Manders never examined Plaintiff. (Dkt. 12, at 33). According to the Commissioner, plaintiff has waived this argument by not objecting to Dr. Manders' opinion while the case was before the ALJ. *See Spuhler*

20

*v. Colvin*, 2014 WL 4855743, at *22 (E.D. Mich. June 17, 2014) report and recommendation adopted in part, 2014 WL 4856153 (E.D. Mich. Sept. 30, 2014) (issues not raised before the ALJ are waived); *see also Blasucci v. Colvin*,  2014 WL 5286526, at *5 (D. N.J. Oct. 15, 2014) ("Courts have previously refused to entertain arguments related to a medical expert's qualifications if a plaintiff failed to object to those qualifications at the hearing").  Second, there were no exhibits submitted after Dr. Manders' opinion that contained any material evidence from the relevant period. (Dkt. 9-7, Pg ID 516-Dkt. 9-8, Pg ID 584).   Third, the Commissioner asserts that the fact that Dr. Manders did not examine plaintiff did not prevent the ALJ from relying on his opinion.  *Gazella v. Comm'r of Soc. Sec.*, 2014 WL 555192, at *11 n. 2 (E.D. Mich. Feb. 12, 2014) ("an ALJ can properly rely on the conclusions of a non-examining, record reviewing physician to support an RFC assessment").  Plaintiff also argues that "[t]here is no indication that Dr. Manders had access to the follow-up reports made by Dr. Friedland, the primary care physician reports from Dr. Crandall, the liver function reports from Dr. Folbe, or most importantly, the treatment notes from the vascular department at the University of Michigan." (Dkt. 12, at 33).  According to the Commissioner, even if Dr. Manders did not have access to this evidence, the ALJ did, and he made clear that he considered everything in the record.  (Dkt. 9-2, Pg ID 40).

Plaintiff suggests that the ALJ "squeaked by" at step five, where he was

required to demonstrate that plaintiff could perform a significant number of jobs in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v) and 404.1566(b). However, according to the Commissioner, relying on vocational expert testimony (Dkt. 9-2, Pg ID 91), the ALJ determined at step five that plaintiff could perform a combined 6,700 jobs in Michigan, and 241,000 in the national economy.  (Dkt. 9-2, Pg ID 48); *see also Lash v. Comm'r of Soc. Sec.*, 2015 WL 3505875, at *3 (E.D. Mich. June 2, 2015) ("courts routinely aggregate numbers of jobs from different categories when determining whether available jobs exist in the national economy"); ("Although there is no 'magic number' for determining the number of jobs that constitutes significant work in the national economy, courts have found that as few as 200 regional jobs or 51,000 national jobs constitute significant work in the national economy"). Thus, the Commissioner maintains that there was no Step 5 error.

## III.   DISCUSSION

### A.   Standard of Review

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005);

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding

whether substantial evidence supports the ALJ's decision, "we do not try the case

de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v.*

*McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383,

387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to

evaluate the credibility of witnesses, including that of the claimant." *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). "However, the ALJ is not

free to make credibility determinations based solely upon an 'intangible or

intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247,

quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact

are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the

Commissioner's decision merely because it disagrees or because "there exists in

the record substantial evidence to support a different conclusion." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a

scintilla of evidence but less than a preponderance; it is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486

F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard

23

presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing *Mullen*, 800 F.2d at 545.

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing,

20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

C.    <u>Analysis</u>

The undersigned is trouble by the lack of treating medical opinions in this

25

record, and the ALJ's treatment of the consulting medical opinions.  Although

plaintiff bears the burden of establishing that she is entitled to disability benefits,

courts have recognized that social security proceedings are "inquisitorial rather

than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  As a result, an ALJ

has an affirmative duty to develop the factual record upon which his decision

rests, regardless of whether the claimant is represented by legal counsel at the

administrative hearing.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d

1048, 1051 (6th Cir. 1983).  In this case, there were <u>no opinions from any treating</u>

<u>physician</u> regarding plaintiff's functional limitations, despite regular treatment

from her primary care physician, at least one vascular specialist, and a neurologist.

Moreover, plaintiff's counsel attempted to keep the record open for 30 days after

the hearing so that medical source statements could be obtained, but the ALJ

rejected that request, concluding that he did not need any more information to

decide plaintiff's claim.  Yet, the ALJ, in conducting the credibility analysis,

specifically held that the absence of a treating physician opinion that plaintiff was

more limited than he found in his RFC belied such a conclusion.

This error is further complicated by the ALJ's treatment of the consulting

opinions.  The ALJ gave significant weight to the opinion of Dr. Manders.  Yet, as

plaintiff points out, it is unclear from the record what Dr. Manders' specialty is, or

which records he reviewed to reach his conclusion.  It is also significant that part

26

of Dr. Manders' opinion relies on the statements by plaintiff's treating physicians that she avoid heavy lifting or straining. (Dkt. 9-7, Pg ID 512). Again, Dr. Manders, like the ALJ, seemed to rely on the lack of restrictions imposed by plaintiff's treating physicians. However, none of them opined regarding plaintiff's functional limitations as it pertains to working full-time. This makes perfect sense because plaintiff stopped working in 2007 for reasons entirely unrelated to her health or disability, long before the issues presented here manifested themselves. Therefore, it appears that her physicians would have had no reason to offer such opinions in their regular treating notes, as physicians typically do when treating a patient who is working. Notwithstanding, both the ALJ and Dr. Manders relied on the lack of functional work-related restrictions in analyzing whether plaintiff met or equaled the listing, in developing their opinions of her functional limitations, and as to the ALJ, in assessing plaintiff's credibility.[2] In the view of the undersigned, under these specific circumstances, the record was not fully and fairly developed and this matter should be remanded so that opinions from

---

[2] The undersigned is not persuaded by the Commissioner's waiver argument. The first case relied on by the Commissioner is *Spuhler v. Colvin*, 2014 WL 4855743 (E.D. Mich. June 17, 2014), report and recommendation adopted in part, 2014 WL 4856153 (E.D. Mich. Sept. 30, 2014), in which Magistrate Judge Morris concluded that the plaintiff had waived the error to request a medical advisor opinion because that issue was not raised before the ALJ and could have been. Here, while plaintiff could have raised the issue of Dr. Manders qualifications at the hearing, that is only one part of plaintiff's objection. Plaintiff could not have, and need not, predict, what weight would be given to that opinion or how the ALJ would rely on it. The Court was unable to view the second case cited by the Commissioner, as it is unavailable online. *Blasucci v. Colvin*, 2014 WL 5286526, at *5 (D. N.J. Oct. 15, 2014).

27

plaintiff's treating physicians regarding whether she met or equaled Listing 4.10 and her functional limitations before her last date insured can be obtained. Plaintiff's credibility and RFC will necessarily have to be re-evaluated after such assessment are obtained.  The ALJ may also need to obtain new vocational expert testimony based on any changes in the RFC resulting from the new assessments.

A similar error was also made with respect to the ALJ's treatment of the consulting physicians who opined that plaintiff did, in fact, have a determinable mental impairment.  (*See* Dkt. 9-7, Pg ID 421-425) (Plaintiff diagnosed by Dr. Terrance Mills and Sandra Coutu, LLP with major depressive disorder, generalized anxiety disorder, and panic disorder on December 10, 2012).  Further, on December 17, 2012, Dr. Liu reviewed plaintiff's medical records and concluded that she had an affective disorder and an anxiety disorder that moderately restricted her activities of daily living and imposed moderate difficulties in maintaining social functioning, along with moderate difficulties in maintaining concentration, persistence, or pace.  (Dkt. 9-3, Pg ID 109-11).  The ALJ gave Dr. Liu's opinion no weight because there was insufficient evidence of plaintiff's treatment for a mental impairment in the record.  Yet, plaintiff's primary care physician had been noting and treating her anxiety for quite some time and well before plaintiff's last date insured.  (Dkt. 9-7, Pg ID 244 (treated with Ativan for anxiety on 9/22/11); Dkt. 9-7, Pg ID 297 (notation of treatment encounter for

anxiety on 9/7/11 with Dr. Crandall); Dkt. 9-7, Pg ID 299 (9/17/12 note that

plaintiff started taking Xanax for anxiety on 9/7/11); Dkt. 9-7, Pg ID 301 (5/29/12

note that plaintiff started taking Xanax for anxiety on 9/7/11); Dkt. 9-7, Pg ID 308

(9/26/11 note that plaintiff started taking Xanax for anxiety on 9/7/11); Dkt. 9-7,

Pg ID 311 (prescription for Xanax given by Dr. Crandall)).  Despite three

physicians diagnosing plaintiff with anxiety (and two with depression) and

plaintiff receiving medical treatment for her anxiety for one year before she filed

her claim and for over two years before the hearing, the ALJ found that plaintiff

had no medically determinable mental impairment.  This conclusion is not

supported by substantial evidence.

However, typically, the omission of an impairment from the step two

findings would not warrant remand where the ALJ found that plaintiff had at least

one impairment that met the criteria for severity at step two, and thereafter

proceeded to step three in the sequential analysis.  *See Maziarz v. Sec'y of Health*

*& Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (holding that because the

Secretary had found at least one other "severe" limitation, the severity of

Maziarz's cervical condition was irrelevant for the step two analysis).  If a

claimant has more than one impairment, the ALJ must consider all medically

determinable impairments when assessing the RFC, including those that are not

severe.  20 C.F.R. § 404.1545(a)(3); *Fisk v. Astrue*, 253 Fed.Appx. 580, 584 (6th

Cir. 2007) (noting that once the ALJ determines at least one severe impairment, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'"). Here, the ALJ included "only incidental contact with the general public, and occasional contact with coworkers and supervisors" in the RFC. This however, does not address the moderate impairment in concentration, persistence, or pace noted by Dr. Liu. Given that this matter must be remanded to obtain assessments from plaintiff's treating physicians regarding her functional limitations, which includes any functional limitations resulting from her mental impairments, the remand should include a reassessment of plaintiff's mental impairment and any resulting functional limitations.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **GRANTED**, that Defendant's motion for summary judgment be **DENIED**, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be **REVERSED AND REMANDED** for proceedings consistent with this Report and Recommendation.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 22, 2016                    s/Stephanie Dawkins Davis
                                         Stephanie Dawkins Davis
                                         United States Magistrate Judge

31

## **CERTIFICATE OF SERVICE**

I certify that on <u>August 22, 2016</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

<div style="margin-left:40%">

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov

</div>